UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RONALD GRASSEL,

                        Plaintiff,

              - against -

DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                        Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
12–CV–1016 (PKC)

PAMELA K. CHEN, United States District Judge:

    *Pro se* Plaintiff Ronald Grassel ("Grassel") brought this action against his employer, the

Department of Education of the City of New York ("DOE"), alleging violations of Title 42,

United States Code, §§ 1981, 1983, and 1985(3), the Americans with Disabilities Act ("ADA"),

and the New York State Human Rights Law ("NYSHRL").  In his Complaint, Grassel alleged,

*inter alia*, that the DOE had subjected him to an impermissible medical exam and disability-

related inquiry, discriminated against him based on a perceived disability, and retaliated against

him for filing a charge with the U.S. Equal Employment Opportunity Commission.  In a

Memorandum and Opinion ("M&O"), dated September 24, 2015, this Court granted summary

judgment to the DOE on Plaintiff's ADA and NYSHRL claims of discrimination based on a

perceived disability, Plaintiff's ADA and NYSHRL claims of retaliation, and Plaintiff's Section

1981, 1983, and 1985(3) claims.  *Grassel v. Dept. of Educ. of the City of New York* (*Grassel I*),

No. 12–CV–1016, 2015 WL 5657343, at *13 (E.D.N.Y. Sept. 24, 2015).  However, the Court

denied Defendant's summary judgment motion as to Plaintiff's impermissible medical exam and

disability-related inquiry claim under the ADA because the DOE's motion papers made no

attempt to assert that the medical exam and inquiry at issue were "job-related and consistent with

business necessity," as required under the ADA. *Id.* at *7–8. The Court allowed the DOE to address this remaining claim in a supplemental summary judgment motion.[1] (Dkt. 63 ("Def. Supp. Mem.").) The Court directed the DOE to submit as part of its briefing, to the extent it could, an affidavit attesting to the DOE's policy and business necessity for requiring its employees to undergo medical exams and answer questions relating to their physical and mental health. (*See* 11/17/2016 Order.)

In its supplemental motion, the DOE, for the first time, raised the argument that Plaintiff must allege injury-in-fact in order to recover damages under Section 12112(d) of the ADA ("ADA Section 12112(d)"), the section that prohibits employers from requiring employees and job applicants to undergo medical exams and from posing disability-related inquiries to employees. (Def. Supp. Mem at 2–3.) In light of this belated argument, the Court allowed Plaintiff to supplement his Complaint to the extent he had intended to allege emotional or physical injury as a result of the medical exam and disability-related inquiry at issue. On December 16, 2016, Plaintiff supplemented his Complaint. (Dkt. 66.) On January 5, 2017, the Court heard oral argument on Defendant's supplemental motion.

For the reasons set forth below, the Court GRANTS summary judgment to the DOE on Plaintiff's sole remaining claim.

---

[1] The Court allowed the DOE to file this supplemental motion because it was unclear from Plaintiff's 156-page *pro se* Complaint (Dkt. 1–1) whether he was pursuing a claim of impermissible medical examination and disability-related inquiry under 42 U.S.C. § 12112(d)(4)(A). (*See* 9/21/2016 Minute Entry.)

## I. FACTS[2]

On January 18, 2011, under the DOE's directive, Grassel met with Dr. Ann Garner ("Dr. Garner"), a School Medical Inspector employed by the DOE, for a psychological evaluation ("2011 Exam"). (Def. 56.1, ¶ 7.)[3] As part of the 2011 Exam, Grassel was given a form to complete that asked about his physical and mental health history ("DOE Form"). (Dkt. 38–1, Deposition of Ronald Grassel dated August 16, 2013 ("Grassel Dep.") at 190:21–22.)[4] At the exam, Dr. Garner asked Grassel several questions. (Grassel Dep. at 192:5–8.) While it is

---

[2] The Court assumes the parties' familiarity with the relevant facts, which were set forth in detail in the Court's September 2015 M&O, and only recites those facts pertaining to Plaintiff's medical exam on January 18, 2011. Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

[3] The 2011 Exam was the culmination of a protracted dispute between the DOE and Grassel that began in 1997, when Grassel refused to submit to a psychiatric exam ordered by the DOE, following an episode in which Grassel exhibited "bizarre and irrational behavior" in the presence of his then-principal. *See Grassel I*, 2015 WL 5657343, at *1; *Grassel v. Bd. of Educ. of City of N.Y.*, 301 A.D.2d 498, 498, 753 N.Y.S.2d 138 (App. Div. 2003) ("On June 13, 1997, the plaintiff, a high school teacher, exhibited bizarre and irrational behavior in front of his supervisor, the principal . . . . By letter dated, June 16, 1997, addressed to plaintiff, [the principal] set forth the facts and circumstances of the incident, and stated that the plaintiff's actions 'might [constitute] conduct unbecoming a teacher.'"). Based on his refusal to appear, Grassel was suspended for insubordination, starting in 1998. *Grassel I*, 2015 WL 5657343, at *1. Over the next 13 years, Grassel fought his suspension and eventual termination through the DOE's administrative process and State court, which led to a 2010 New York Supreme Court order requiring Grassel to submit to a "medical examination," pursuant to New York Education Law § 2568. *See id.* at *2. This court-ordered exam became the 2011 Exam. *Id.*

[4] Grassel maintains that the January 18, 2011 medical examination was not a psychological exam (Dkt. 35, Pl. 56.1, ¶ 17), and did not meet the definition of a medical exam, because Dr. Garner did not take his height, weight, blood pressure, and pulse, or conduct a rudimentary eye examination (Dkt. 64. 64, Plaintiff's Opposition to Defendant's Supplemental Motion for Summary Judgment ("Pl. Supp. Opp.") at ECF 1, 3). It is not clear from the record on summary judgment that Grassel completed the DOE Form; he includes only a blank form in his Complaint. (*Id.* at 192:1518; Compl. at ECF 14.)

unclear exactly what those questions were, according to Dr. Garner's notes, Grassel's vision was discussed. The notes indicate that Grassel had suffered a retinal detachment and tear in his left eye and that his vision was poor at that time. (Def. 56.1, ¶ 14; Compl. at ECF 69–70.)[5] Grassel denies having any problems with his eye (Compl. at ECF 6, ¶ 19) or bringing up a vision problem with Dr. Garner (Pl. 56.1 at ECF 2).[6] Though Dr. Garner found Grassel psychologically fit, she deemed him "not fit" to return to work pending further medical clearance, citing his self-reported vision problems. (Def. 56.1, ¶ 16; Compl. at ECF 71.) Dr. Garner requested documentation from Grassel's treating ophthalmologist regarding the diagnosis, current signs and symptoms, treatment, and prognosis regarding Grassel's left eye. (Dkt. 38–4, Hearing Officer's Opinion and Award dated May 14, 2012 ("Hearing Op.") at ECF 9.) Grassel submitted the requested documentation, and Dr. Garner scheduled a follow-up medical exam that was to include a vision exam. (*Id.* at ECF 10.) Grassel, however, did not appear for that exam. (Def. 56.1, ¶ 19; Hearing Op. at ECF 9.) Due to Grassel's failure to appear, the DOE rescheduled the exam twice. (Def. 56.1, ¶¶ 18–19; Hearing Op. at ECF 9–11.) Grassel did not appear for any of the exams and objected to the follow-up exam as being outside the scope of the 2011 Exam. (Hearing Op. at ECF 11.)

---

[5] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

[6] Plaintiff's various statements about the condition of his eye are inconsistent and seemingly contradictory. For example, Plaintiff stated in his 56.1 counter-statement that he never told Dr. Garner that "his vision was very poor." (Pl. 56.1 at ECF 2 (responding to Def. 56.1 ¶ 14).) However, in his complaint, he alleges that he told Dr. Garner that his eye condition was "100% healed." (Compl. at ECF 6.) Similarly, though Grassel claims in his Complaint that he has never had any eye problems, at oral argument, he described at length the longstanding eye and vision impairments that he has had, as well as the multiple eye surgeries he has had to undergo.

Based on Grassel's failure to appear for a follow-up exam, the DOE brought disciplinary charges against Grassel under N.Y. Education Law § 3020-a, alleging that the failure constituted insubordination and just cause for termination. (Def. 56.1 ¶ 20; Hearing Op. at ECF 4.) The matter was presented to an arbitrator over the course of multiple hearings between August 2011 and February 2012. (*Id.* at ECF 3.) As summarized in *Grassel I*:

> On May 24, 2012, the arbitrator issued his opinion, ultimately concluding that Grassel's failure to report for the follow-up medical exam constituted insubordination and that he should be suspended without pay. (Hearing Op. at ECF 18–19, 22, 23–24.) Because Grassel had already been suspended without pay beginning in 1998, the arbitrator determined that the entire period of his suspension would represent the full duration and satisfaction of his penalty. (*Id.* at ECF 23–25.) The arbitrator ordered Grassel to be reinstated within 30 days of the opinion. (*Id.* at ECF 25.) The DOE did so. (Grassel Dep. at 179:4–7.)
>
> On June 14, 2012, Grassel moved to vacate the arbitrator's opinion and award against him, seeking a return to active status as a teacher retroactive to 1997. (Def. 56.1 ¶ 24.) The Supreme Court of New York, New York County, issued a decision upholding the Opinion and Award in the DOE's disciplinary proceeding against Grassel. *See In the Matter of the Application of Ronald Grassel*, 2012 N.Y. Misc. LEXIS 5829 (Sup. Ct. Dec. 15, 2012). The Appellate Division, First Department, subsequently upheld the lower court's decision. *See In re Ronald Grassel*, 983 N.Y.S.2d 724 (N.Y. App. Div. 2014).

*Grassel I*, 2015 WL 5657343, *3–4.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint in this action on March 1, 2012. Defendant answered on March 28, 2012. Defendant moved for summary judgment on August 18, 2014, and Plaintiff opposed the motion on September 29, 2014. The Court granted in part and denied in part Defendant's motion for summary judgment on September 24, 2015. On October 7, 2016, Defendant filed a supplemental motion for summary judgment, and Plaintiff filed his response on October 21, 2016. On December 16, 2016, Defendant filed an affidavit attesting to the DOE's policy and business necessity for requiring its employees to submit to a medical exam pursuant

to N.Y. Education Law Section 2568 ("NYEL Section 2568"). On the same day, Plaintiff supplemented his Complaint with allegations of injury caused by the 2011 Exam. On January 5, 2017, the Court held oral argument on Defendant's supplemental summary judgment motion.

**DISCUSSION**

## I.     SUMMARY JUDGMENT STANDARD

A defendant seeking summary judgment must establish that "there is no genuine dispute as to any material fact," and that they are thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted). In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted).

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *see also id.* at 251–52 ("In essence, though, the inquiry . . . [is] whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. PLAINTIFF'S CLAIM & THE ADA

Plaintiff claims that that the DOE violated the ADA by directing him to undergo a medical exam on January 18, 2011, and to complete the DOE Form. (Dkt. 1-1, Compl. at ECF 3–6; Dkt. 36 ("Pl. Opp.") at ECF 4; Grassel Dep. at 190:19-191:8.)

ADA Section 12112(d)(4)(A) prohibits a "covered entity" from requiring an employee to undergo a medical exam or inquiring into whether an employee is an individual with a disability or into the nature or severity of a disability. 42 U.S.C. § 12112(d)(4)(A). However, the ADA has an exception to its general prohibition of such exams and inquiries when the "examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see also Conroy v. N.Y. State Dep't of Correc. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (referring to this exception as the "business necessity defense"). ADA Section 12112(d)(4)(B) allows a covered entity to "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). While Plaintiff's 2011 Exam could be deemed a permissible inquiry into Grassel's ability to perform job-related functions, *id.*, because Grassel was asked about, *inter alia*, his vision and eye condition, any past injuries or surgeries, and prescription medications he had taken, it also constitutes an inquiry into whether Grassel is an individual with a disability and into the nature or severity of a disability, which is generally prohibited under ADA Section 12112(d)(4)(A). *See Margherita v. FedEx Exp.*, 511 F. App'x 71 (2d Cir. 2013) (summary order). Thus, the issue is whether the exception (*i.e.,* the

business necessity defense) under ADA's Section 12112(d)(4)(A) applies to the 2011 Exam. *See Conroy*, 333 F.3d at 98–98.[7]

The Second Circuit, in *Conroy*, held that:

> [I]n proving a business necessity, an employer must show more than that its inquiry is consistent with "mere expediency." An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its business. Instead, the employer must first show that the asserted "business necessity" is vital to the business. . . . The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.

*Id.* at 97–98.

## III. DEFENDANT'S MOTION

The DOE seeks summary judgment on three grounds: (1) the Appellate Division's finding in *Grassel v. Board of Education of the City of New York*, 301 A.D.2d 498, 753 N.Y.S.2d 138 (App. Div. 2003), that Grassel engaged in behavior warranting a medical exam under NYEL Section 2568 precludes Plaintiff from arguing that the 2011 Exam was not job-related or consistent with business necessity (Def. Supp. Mem at 2); (2) the 2011 Exam constituted a "business necessity" because the purpose was to determine Grassel's fitness for duty (Dkt. 65, Affidavit of Lorraine Haynes dated December 15, 2016 ("Haynes Affidavit")); and (3) Grassel has not pled any injury as a result of the 2011 Exam, and thus his ADA claim constitutes a mere technical violation of the statute that should be dismissed. (Def. Supp. Mem at 2.) As explained below, while the Court finds that the Appellate Division's ruling does not preclude Plaintiff's

---

[7] This Court has already determined that the DOE is a "covered entity" subject to the ADA's Section 12112(d) general prohibition on medical exams and disability-related inquiries, and that Grassel may bring a claim under Section 12112(d)(4)(A) without proving that he had a disability that was unknown to the DOE. *See Grassel I*, 2015 WL 5657343, at *6–7.

ADA claim, the Court finds that the 2011 Exam falls under the exception under Section 12112(d)(4)(A) of the ADA and that Grassel's failure to allege or demonstrate any injury is fatal to his ADA claim.

###### A.    Collateral Estoppel

The DOE maintains that the Appellate Division's January 13, 2003 decision, *Grassel*, 301 A.D.2d 49—a decision issued about eight years before Grassel's 2011 Exam—already determined that the DOE's directive that Grassel undergo a medical exam and the 2011 Exam were "job-related and consistent with business necessity."  (Def. Supp. Mem at 2.)  There, the Appellate Division affirmed the dismissal of Grassel's complaint in which he sought damages under 42 U.S.C. § 1983 and reinstatement to his position as a tenured teacher with back pay and benefits.  *See Grassel*, 301 A.D.2d at 498–99.  The DOE argues that the Appellate Division's 2003 decision precludes Grassel's claim that the 2011 Exam violated ADA Section 12112(d)(4). The Court agrees that the Appellate Division's decision resolved the issue of whether the DOE's directive itself was job-related.  However, the Appellate Division did not address whether the 2011 Exam was conducted in a manner that was "consistent with business necessity" as required under the ADA.

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  Title 28 U.S.C. § 1738 requires federal courts to give State judgments the same preclusive effect that those judgments would have in the courts of the rendering State.  "Under New York law, collateral estoppel will preclude a federal court from deciding an issue if (1) the [identical] issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first

proceeding." *Reddy v. Catone*, 630 F. App'x. 120, 121 (2d Cir. 2015) (summary order) (quoting *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007)); *see also Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) ("[C]ollateral estoppel has two essential elements. 'First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.'" (quoting *Juan C. v. Cortines*, 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581 (N.Y. 1997)). "Additionally, the issue that was raised previously must be decisive of the present action." *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002)). Third parties may raise collateral estoppel against a party who had fully and fairly litigated an issue to prevent that party from raising the same issue in a subsequent lawsuit. *See Austin v. Downs, Rachlin & Martin*, 270 F. App'x 52, 54 (2d Cir. 2008) (summary order) ("Under non-mutual collateral estoppel, if a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third parties unrelated to the original action can bar the litigant from relitigating that same issue in a subsequent suit."); *see also Lipin v. Hunt*, No. 14–CV–1081, 2015 WL 1344406, at *5 (S.D.N.Y. Mar. 20, 2015) ("The doctrine of non-mutual defensive collateral estoppel 'precludes a plaintiff from relitigating identical issues by merely switching adversaries.'" (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979))).

"The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues[,] . . . whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issues." *Constantine v. Teachers College*, 448 F. App'x. 92 (2d Cir. 2011) (summary order) (quoting *Evans v. Ottimo*, 469 F.3d 278, 281–82 (2d Cir. 2006)). The Second Circuit has cautioned that "[i]ssue preclusion

will apply only if it is quite clear that these requirements have been satisfied, lest a party be 'precluded from obtaining at least one full hearing on his or her claim.'" *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995) (quoting *Gramatan Home Investors Corp. v. Lopez*, 386 N.E.2d 1328 (1979)).

The Court finds that although the Appellate Division's 2003 decision has decided one aspect of the ADA analysis, it does not preclude Plaintiff's federal ADA claim because the issue decided by the Appellate Division only partially addresses the legal standards that apply to this case. While the Appellate Division, in effect, made a finding that the DOE's *ordering* of the 2011 Exam itself was for the purpose of determining whether Grassel could "perform his job-related functions," as permitted by the ADA, it neither addressed nor determined whether the *scope* of that exam was also "job-related and consistent with business necessity," as further required by the ADA. *See* 42 U.S.C. § 12112(d)(4)(A).

Courts have found that issue preclusion does not apply when different legal standards are brought to bear on the same facts. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005) (holding that even though the State court ruled as a matter of State law that absentee ballots were improperly issued and could not be counted, that decision did not preclude a subsequent action by voters to compel counting of the ballots because the State court did not discuss the voters' Section 1983 claim); *McKithen*, 481 F.3d at 105–106 (finding State court's denial of a post-conviction motion to compel DNA testing of a knife introduced at trial had no preclusive effect in subsequent Section 1983 action alleging due process violation based on same failure to conduct DNA testing, because federal court could not determine whether the standard for proving a violation of federal constitutional right to post-conviction DNA testing was "more or less stringent" than that of state statute); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,

937 F.2d 729, 734 (2d Cir. 1991) ("Issues that may bear the same label are nonetheless not identical if the standards governing them are significantly different." (citation omitted)); *see also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014) (finding no issue preclusion and explaining that "[t]he hearing officer's ultimate conclusion—that [plaintiff] had committed disciplinable misconduct and was incompetent—were guided by the particular legal framework and standards applicable in section 75 proceedings.  The section 75 framework differs substantially from the legal framework for state and federal employment discrimination law applicable to [plaintiff's] federal jury trial.").

NYEL Section 2568 permits a superintendent of schools to require that an employee undergo medical examination "to determine the mental or physical capacity of [the employee] to perform his duties, whenever it has been recommended in a report in writing that such examination should be made."  N.Y. Educ. Law § 2568.[8]  In Grassel's State court proceeding, the Appellate Division "unambiguously relie[d] on state law alone," *Hoblock*, 422 F.3d at 94, in finding that Grassel's "bizarre and irrational behavior" warranted the superintendent's "reasonable" directive for Grassel to be medically examined under NYEL Section 2568.  *See Grassel*, 301 A.D.2d at 498–99.  The Appellate Court's finding that the DOE properly ordered the 2011 Exam establishes the appropriateness of the *ordering* of the exam under ADA Section 12112(d)(4)(A).  However, the Appellate Division was not required, and did not decide whether the *scope* of the 2011 Exam was narrowly tailored to determine Grassel's fitness to perform his

---

[8] While this report "should contain some facts and circumstances upon which the recommendation for a medical examination is predicated," *Groad v. Jansen* 173 N.Y.S.2d 946, 948 (N.Y. Sup. Ct. 1958), there is no indication that it must include any discussion of whether the exam is a business necessity or appropriately tailored so as to avoid unnecessary intrusion into an employee's medical information.

job, as required under that section.[9]  Therefore, the Court finds that the Appellate Division's judgment does not collaterally estop Grassel's ADA claim.[10]

## B.     Business Necessity Defense

The DOE's second argument is that there is no genuine dispute of material fact as to whether the 2011 Exam was "job-related and consistent with business necessity" under the ADA. *See Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y. City Transit Auth.*, 341 F. Supp. 2d 432, 446 (S.D.N.Y. 2004) (noting that the employer has the burden of proof).

Under the ADA, a medical exam or inquiry is job-related and consistent with business necessity if an employer can demonstrate that (1) the asserted business necessity is "vital to the business," rather than merely convenient or beneficial; and (2) the exam/inquiry is a "reasonably effective method" of achieving the employer's asserted business necessity (*i.e.* genuinely serves the asserted goal).  *Conroy*, 333 F.3d 88, 97–98.

---

[9] Indeed, the Appellate Division did not consider or determine whether the 2011 Exam was intended to assess only Grassel's mental *or* physical health, or both.  As discussed *infra*, given that the circumstances that justified the DOE ordering the exam involved Grassel's "bizarre and irrational behavior," the 2011 Exam should have been limited to determining Grassel's psychological fitness to perform his job duties and not his overall physical health. However, the Appellate Division's factual finding that Grassel "exhibited bizarre and irrational behavior in front of his supervisor, the principal" in 1997, *Grassel*, 301 A.D.2d at 498–99, precludes him from arguing otherwise.  *See Matusick*, 757 F.3d at 49 (finding that in deciding both State law and Section 1983 claims the jury was required to accept a fact finding by a previous administrative hearing officer that plaintiff had failed to perform his duties satisfactorily).

[10] Because the DOE has failed to demonstrate the first requirement for collateral estoppel (*i.e.*, identicality of issues), the Court need not analyze the other requirements for collateral estoppel.  In any event, the resolution of this issue does not affect the Court's decision dismissing Plaintiff's ADA claim because, as discussed *infra*, the Court finds that *both* the ordering and scope of the 2011 Exam satisfied the requirements for application of the exception under Section 12112(4)(d)(A).

1.      The DOE's Vital Business Necessity: "Fitness for Duty" as a Business
        Necessity

The first step in articulating a business necessity defense is to show that the asserted purpose of the medical exam or inquiry is, in fact, a business necessity. *See Conroy*, 333 F.3d at 97–98. "[W]hat constitutes a business necessity will undoubtedly vary in different workplaces." *Id.* at 99. The employer cannot make this showing of necessity by simply relying "on reasons that have been found valid in other cases." *Id.* at 101. A business necessity exists if an employer can "demonstrate that a medical examination or inquiry is necessary to determine [ ] whether the employee can perform job-related duties when the employer can identify legitimate non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Id.* at 98.

The DOE claims that the 2011 Exam was justified by the DOE's need "to determine [Grassel's] fitness for duty" (Haynes Affidavit at ¶ 3), noting that in 1997 Grassel exhibited "bizarre and irrational" behavior in front of his supervisor and that this behavior prompted the DOE's 1997 ordering of Plaintiff's psychological evaluation (Def. Supp. Mem.). The DOE explains that, originally, the sole purpose of the exam was to administer a psychiatric exam. (*Id.*) However, after Grassel refused to appear for that initial exam in 1997, he was suspended and there ensued a protracted administrative and legal battle that lasted over 13 years, culminating in Grassel's reinstatement but with the condition that he submit to the 2011 Exam. *Grassel I*, 2015 WL 5657341, at *2–4.

The Court agrees with the DOE that its need to determine a teacher's psychological capacity to properly carry out his duties is a vital business necessity. *See* 42 U.S.C. § 12112(d)(4)(B); *see also, Ward v. Merck & Co.*, 226 F. App'x. 131 (3d Cir. 2007) (not for publication) (observing that a fitness-for-duty exam may qualify as a business necessity). Moreover, many courts have found a valid business necessity when a school staff member is

subjected to a medical exam that is prompted by displays of worrisome behavior at work or emotional volatility. *See e.g., Mickens v. Polk Cty. School Bd.*, 430 F. Supp. 2d 1265, 1280 (M.D. Fl. 2006) (erratic behavior in response to performance criticism was a valid basis for requiring medical exam); *Miller v. Champaign Comty. Unit School District*, 983 F. Supp. 1201, 1206–07 (C.D. Ill. 1997) (a school board's psychological exam of an employee is "job-related and consistent with a business necessity" if that employee exhibits "even mild signs" of "paranoid or agitated behavior" that causes the school administration to be concerned about the personal safety of those in contact with the employee); *Sullivan v. River Valley School Dist.*, 20 F. Supp. 2d 1120, 1126 (W.D. Mich. 1998) (a school district had both a right and a duty to determine the teacher's ability to perform his job duties after the teacher displayed confrontational outbursts and a breakdown of interpersonal skills), *aff'd*, 197 F.3d 804 (6th Cir. 1999); *see also Rodriguez v. School Bd. of Hillsborough Cty., Fla.*, 60 F. Supp. 3d 1273, 1278 (M.D. Fla. 2014) (finding that school requiring plaintiff to undergo a psychological exam and be deemed fit for duty before returning to work did not violate the ADA, where plaintiff shared with principal that plaintiff had had suicidal thoughts in the past).

The record—especially material submitted by Plaintiff himself (Pl. Opp. at ECF 59–83)—is replete with evidence that, prior to the DOE's ordering of the psychological exam in 1997, it had a "legitimate, non-discriminatory[] reason to doubt [Grassel's psychological] capacity to perform . . . his duties" and to maintain a safe and cooperative school environment. *See Hanflad v. Brennan*, No. 10–CV–6106, 2015 WL 6134177, at *6 (W.D.N.Y. Oct. 16, 2015) (noting the first prong of the test satisfied where defendant asserted that a general health and psychiatric exam was initiated "to determine whether Plaintiff experienced a mental health issue that compromised her ability to work safely and cooperatively"). Here, Plaintiff's own evidence

shows that the school where he was teaching in 1994 had instructed him that he could not expropriate school property for personal use, that he should refrain from removing trash from refuse containers, and that bringing items removed from the dumpster into a classroom was a potential public health hazard. (Pl. Opp. at ECF 65–66.) There is no question that a public health hazard at a school constitutes an issue of "workplace safety," which has explicitly been recognized as a valid business necessity. *See Conroy*, 333 F.3d at 97 ("[B]usiness necessit[y] may include ensuring that the workplace is safe and secure.").

The record also reflects that, prior to ordering the 1997 psychological exam, the DOE was concerned about Plaintiff's ability to interact with students effectively. In a letter to Plaintiff, the school where he taught in 1995 and 1996 detailed numerous unsatisfactory observations of his social studies class. (Pl. Opp. at ECF 62–63.) A 1994 letter to Plaintiff from the assistant principal at Van Arsdale High School discussed how Plaintiff made one of his students feel embarrassed and how he grabbed another student and screamed at him. (*Id.* at ECF 68.) In another letter from a principal to Plaintiff, the principal noted that he had directed Plaintiff to avoid leaving students unattended while class was in session, and to handle small infractions by students in an unobtrusive and non-confrontational manner rather than derailing class. (*Id.* at ECF 69.) That principal also stated that Plaintiff's behavior was inappropriate and that Plaintiff had no regard for the students' needs. (*Id.* at ECF 70.) On another occasion, the same principal stated in a letter to Plaintiff that students sought to transfer from Grassel's class in rather high numbers, and attached a parent's request that the school transfer her child out of Grassel's class. (*Id.* at ECF 74.) The principal shared with Grassel that he found Grassel's "unwillingness to recognize that there is a problem disturbing" and that Grassel's relationship with students needed serious improvement. (*Id.*) In a 1996 letter, the assistant principal at Van

Arsdale High School again warned Grassel that he was not to leave the class unattended. (*Id.* at ECF 79.)

Given Grassel's well-documented history of inappropriate and troubling behavior, beginning at least as early as 1994, the Court finds, as a matter of law, that the DOE had a business necessity to evaluate whether Plaintiff could carry out his duties as a teacher, as far back as 1997 and continuing through the 2011 Exam.

2. Was the 2011 Exam a "Reasonably Effective Method of Achieving" the DOE's Stated Business Necessity?

The Court next considers whether the DOE used reasonably effective methods to assess Grassel's fitness as a teacher. As discussed earlier, the Second Circuit explained that while an "employer need not show that the examination or inquiry is the only way of achieving a business necessity, the examination or inquiry must be a reasonably effective method of achieving the employer's goal." *Conroy*, 333 F.3d at 98.

Based on the facts of this case—in particular, the exceptionally long history of the DOE's concerns about Grassel's psychological health and his interactions with students, and the DOE's repeated attempts over a more than 13-year period to evaluate Grassel's job fitness—the Court finds, as a matter of law, that the 2011 Exam constituted a reasonably effective method of achieving the DOE's business necessity of determining Grassel's fitness to teach that was "no broader or more intrusive than necessary." *See id.*

a. 2011 Exam Inquiries into Physical Health

Although the purpose of the 2011 Exam—based on the circumstances prompting the original exam in *1997*—was to evaluate Grassel's psychological fitness, Dr. Garner and Grassel also discussed Grassel's vision during the exam. With respect to Dr. Garner's attention to Grassel's vision issues, the DOE explains that "[m]ental health and physical health are directly

connected, and no medical professional can look at one condition in isolation. . . . [S]erious illnesses can affect one's daily life and psychological health."[11]   (Haynes Affidavit ¶ 3.) Lorraine Haynes, the Director of the DOE's Director of Medical, Leaves, and Records Administration, further explains in her affidavit that it is necessary to look at a wide range of health concerns and medications taken when assessing a person's mental status or fitness. (Haynes Affidavit ¶ 3.)  She explains that because mental and physical health are interconnected, an evaluation of a person's mental health necessarily requires comprehensive information about the person's health.  Therefore, prior to any exam ordered pursuant to NYEL Section 2568, the DOE asks examinees to complete a medical history form that would provide "the medical professional with necessary information to perform the medical and/or psychological examination."  (*Id.*)    Notably, nothing in the record contradicts Haynes's explanation about the need for the examining doctor to have comprehensive medical information for a psychological exam.  Grassel has put forth no evidence on this issue, and the Court cannot independently determine the proper scope for a physical health inquiry in the context of a mental health assessment.  Furthermore, given the unique circumstances of this case, including the difficulty of getting Grassel to comply with the DOE's medical exam directive, which had been outstanding for over 13 years, the Court finds that the DOE had a business need to conduct a thorough and comprehensive evaluation to determine Grassel's fitness to perform his job responsibilities. Accordingly, the Court finds, as a matter of law, that the 2011 Exam was "no broader or more intrusive than necessary", as required by the ADA.

---

[11] The Court notes, in fact, that during oral argument in this case, Grassel became extremely agitated when discussing his vision problems and multiple eye surgeries, and complained about the considerable mental anguish that his visual impairments and conditions had caused, and continued to cause, him.

b.  The DOE Form

The Court similarly finds that the DOE Form used as part of the 2011 Exam was "no broader or more intrusive than necessary" and thus did not violate the ADA.  Consistent with the DOE's explanation about the need to obtain information about a person's physical health when evaluating the person's mental health and fitness, the DOE Form asks the following questions:

- Have you ever had an operation on any of the following [organ or body part]? If so please indicate DATE.
- What personal Injuries OR Accidents have you had?
- Have you ever been hospitalized?
- What medication are you currently taking?
- Have you ever consulted a psychiatrist, psychologist or psychoanalyst?
- Indicate the date of absences from duty for illness during the past [1] year and the causes of these absences.
- Family history: Is there any history in your family of epilepsy, mental disorders, diabetes, or high blood pressure?
- Do you have a military disability?  What is the % of the disability?

(Compl. at ECF 14.)[12]

The Court considers the propriety of the DOE Form in the context of the history that led to the exam, which began with the DOE ordering Grassel to submit to a psychological exam back in 1997, following a series of incidents that caused the DOE to be concerned about Grassel's fitness to perform his duties as a teacher.  The DOE originally ordered Grassel's exam after he "exhibited bizarre and irrational behavior in front of his supervisor, the principal."  *See*

_____

[12] These questions plainly qualify as "disability-related inquiries" because they are likely to elicit information about a disability.  The EEOC's Compliance Manual gives as examples of "disability-related inquiries" asking an employee whether he is taking prescription drugs or medication, asking about an employee's prior workers' compensation history, and asking an employee a broad question about his impairments such as, "What impairments do you have?" *EEOC Compliance Man.* 902:0183; *see also Conroy*, 333 F.3d at 95 (noting that one court found a policy requiring employees to disclose what prescriptions they use to be a prohibited inquiry under the ADA (citing *Roe v. Cheyenne Mountain Conference Resort*, 920 F. Supp. 1153, 1154–55 (D. Colo. 1996), *aff'd in pertinent part*, 124 F.3d 1221 (10th Cir. 1997)).

*Grassel*, 301 A.D. 2d at 498–99.  Moreover, the record evidence indicates that it was not just this one incident that raised concerns about Grassel's fitness for duty.  As previously discussed, the school had to confront Grassel—on multiple occasions—as to his improper and often threatening behavior towards students, including an incident where he grabbed and screamed at a student. (Pl. Opp. at ECF 59–83.)  The DOE explains that because mental and physical health are inextricably intertwined, a medical professional whose goal is to assess the patient's mental health must ask about a wide range of medications that may affect the employee's mental state (*e.g.* anti-anxiety medications, sleeping aids, medications for hypothyroidism, diabetes, migraines, arthritis, and cancer) and a wide range of health concerns.  (Haynes Affidavit ¶ 3.) Again, it is notable that Grassel does not identify information that he was required to disclose on the form that was unrelated to his psychological health.  *See, e.g., Laurent v. G & G Bus Serv. Inc.*, No. 10 Civ. 4055, 2013 WL 5354733, at *5 (S.D.N.Y Sept. 25, 2013) (Koeltl, J. adopting report and recommendation by Smith, M.J.) (finding pre-employment inquiry into job applicant's prescription medication use job-related as the applicant was applying to be a school bus driver and also noting applicant's failure to point to any medications he was required to disclose that was unrelated to his job qualification).

The Court recognizes that the Second Circuit, in *Conroy*, held that the New York State Department of Correctional Services' ("DOCS") sick leave policy, which required employees to submit a general medical diagnosis that was "sufficiently informative as to allow [the agency] to make a determination concerning the employee's entitlement to leave or to evaluate the need to have an employee examined . . . prior to returning to duty" for certain absences, was "not a narrowly tailored inquiry into the employee's ability to carry out her job-related functions [under ADA Section 12112(d)(4)(B)]."  *Conroy*, 333 F.3d at 92, 94, 99 (remanding so that the agency

could submit evidence that it had a legitimate business necessity and that the policy would help alleviate the concern and thus allow the district court to determine whether the policy would fall under the exception under ADA Section 12112(d)(4)(A)). However, this case is distinguishable from *Conroy*, because Grassel is not challenging a policy that applied to every employee regardless of his or her situation and without any particularized showing of business necessity for each medical diagnosis required under the policy. *See id.* at 92, 94, 99. By contrast, Grassel is challenging an agency directive that applied only to him and that was based on his individual employment circumstances and history, which created a clear need for the DOE to determine Grassel's fitness to perform his job.

The Court finds that the DOE Form was a reasonably effective method of assessing Grassel's capacity to teach because (1) the DOE had a strong interest in protecting the health and welfare of its students, (2) the record supports the conclusion that because mental and physical health are intricately intertwined, it was appropriate for the 2011 Exam to inquire into both, and (3) the over 13-year-delay in conducting Grassel's exam, primarily caused by Grassel's repeated refusals, reinforced the need to thoroughly assess Grassel's fitness to perform his duties at the time of the 2011 Exam. *See Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) ("[W]here inquiries into the *psychiatric* health of an employee are job related and reflect a 'concern [ ] with the safety of . . . employees,' the employer may, depending on the circumstances of the particular case, require specific medical information from the employee and may require that the employee undergo a *physical* examination designed to determine his ability to work." (emphasis added)); *Rodriguez*, 60 F. Supp. 3d at 1277 ("Courts recognize that '[e]mployers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims.'" (quoting *Cody v. CIGNA Healthcare*, 139 F.3d

595, 599 (8th Cir. 1998)); *see also Mickens*, 430 F. Supp. 2d at 1275, 1279 (noting that "the mental and emotional fitness of those charged with the well-being of school children is among the most vivid and essential examples of [an employer's legitimate concern]" in finding that "[a]s a matter of law, a school board's psychological examination of an employee is both job-related and consistent with business necessity if that employee exhibits even mild signs of paranoid or agitated behavior that causes the school administration to question the employee's ability to perform essential job duties."); *Watson v. City of Miami Beach*, 177 F.3d 932, 935–36 (11th Cir. 1999) (finding a fitness for duty examination on a police officer job-related and consistent with business necessity where the officer displayed unusually defensive antagonistic behavior towards his co-workers and supervisors but whose job performance was otherwise satisfactory).

*        *        *

Accordingly, the Court finds, as a matter of law, that the DOE had a vital business necessity to determine Grassel's fitness to perform his duties as a teacher and that the 2011 Exam and disability-related inquiry was appropriately tailored to achieve that purpose.[13] Grassel's ADA claim, therefore, is dismissed.

## C.    Failure to show injury

While the Court need not address the DOE's third argument in support of dismissal, it does so and finds that it provides an independent basis for dismissing Grassel's ADA claim. The

---

[13] Although the Court has found that, based on the particular facts of this case, requiring Grassel to submit to the 2011 Exam, including use of the DOE Form, did not violate the ADA, the Court is concerned by the DOE's acknowledgement that it uses the DOE Form for *all* DOE-ordered medical exams, regardless of the purpose of the exam and the circumstances giving rise to it. (Dkt. 67.) The Court cautions the DOE that, in a case that does not present the same history or facts as here, the indiscriminate use of this form might be found to violate the ADA's requirement that disability-related inquiries must be appropriately tailored for the professed business necessity.

DOE's third argument is that even if the DOE committed a "technical violation" of the ADA in connection with its administration of the 2011 Exam, Grassel's ADA claim still should be dismissed because he has neither alleged nor demonstrated any injury. (Def. Supp. Mem. at ECF 2–3.) The DOE asserts that injury is required to establish a claim under Section 12112(d)(4)(A), and that because Grassel has not pled and cannot provide evidence that he suffered any injury by undergoing the 2011 Exam, his ADA claim fails as a matter of law. In short, the DOE argues that a technical violation of Section 12112(d)(4)(A) should not, in and of itself, give rise to liability. The Court agrees that Grassel has not even satisfied a minimal burden of showing injury so as to permit his claim to survive summary judgment.

1.    Injury Requirement for ADA Claim

Although the Second Circuit has not directly addressed the issue of whether an employee alleging a violation of Section 12112(d)(4)(A) must show injury, precedent in this Circuit and elsewhere, in the pre-employment context, establishes that some showing of injury, even if minimal, is necessary for liability under the ADA. In cases alleging impermissible *pre-employment* medical exams and inquiries under ADA Section 12112(d)(4)(A), or violations of confidentiality protections under ADA Sections 12112(d)(3)(B) and 12112(d)(4)(C),[14] courts in this Circuit and elsewhere routinely require a showing of injury. *See, e.g., Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539, 546 (S.D.N.Y. 2012) (finding, in ADA Section 12112(d)(2)(A) pre-employment action, that plaintiff sufficiently showed injury—evidenced by plaintiff taking Valium multiple times per day, having difficulty sleeping, experiencing exacerbation of skin conditions, anxiety and depression—caused by the medical inquiry on plaintiff's job application

---

[14] ADA Sections 12112(d)(3)(B) and 12112(d)(4)C) require that covered entities keep medical records separately from non-confidential information and that access to confidential files be limited. *See* 42 U.S.C. § 12112(d).

form); *Giaccio v. City of New York*, 502 F. Supp. 2d 380, 387–88 (S.D.N.Y. 2007) (dismissing plaintiff's ADA Section 12112(d)(3)(B) claim, in pre-employment action, because he failed to show injury as a result of dissemination of his confidential drug test results to the media and because his allegations of mental and emotional distress were unsupported by evidence); *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 560-65 (5th Cir. 1998) (finding, in pre-employment context, that "damages liability under Section 12112(d)(2)(A) must be based on something more than a mere violation of that provision."); *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) (a pre-employment medical testing case where the court stated, "[C]ourts have required that a nondisabled plaintiff *at least* show some tangible injury-in-fact caused by the § 12112(d) violation."); *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001) (dismissing plaintiff's pre-employment claim for employer's violation of ADA provisions governing the confidentiality of medical records for lack of injury).[15]

While the Court interprets the injury requirement as minimal where violations of the ADA medical exam and confidentiality provisions are alleged, here, Plaintiff has not satisfied even this minimal burden. Plaintiff has neither pled nor demonstrated that the 2011 Exam or any requests that he submit to follow-up visits and provide further documentation as to his vision issues caused him injury, even after the Court granted Plaintiff leave to supplement his Complaint and provide factual allegations of injury caused by the 2011 Exam and related medical inquiries. Plaintiff's supplementation of the Complaint did not provide any new allegations of injury. (Dkt. 66 ("Compl. Supp.").) Rather, Plaintiff simply stated that he had

---

[15] The closest the Second Circuit has come to addressing this issue was in *Conroy*, but there the issue was framed as one of standing. In *Conroy*, the Circuit panel found, without discussing any particular type of injury, that plaintiff "sufficiently alleged that she has suffered and will continue to suffer [ ] injury," for purposes of demonstrating Article III standing. *Conroy*, 333 F.3d at 96.

already alleged injuries in his "October 21, 2016 letter," *i.e.*, Plaintiff's opposition to the DOE's supplemental motion for summary judgment, referred the Court to portions of his Complaint, and asked "that the Court subpoena [medical documents from a hospital] for factual objective, medical evidence." (*Id.* at ECF 2.)

An examination of Plaintiff's arguments as to what injuries he suffered demonstrates that Grassel is unable to identify any injury resulting from the 2011 Exam. In his opposition to the DOE's supplemental motion for summary judgment, Plaintiff states that he is "now part, BLIND[, and] in pain, but for the actions of the DOE on January 18, 2011. The DOE both refused, nor was competent, to perform a medical examination . . . ." (Dkt. 64, Pl. Supp. Opp. at ECF 3.) Plaintiff goes on to say that he was "blinded because the DOE refused to properly exam[ine him] on January 18, 2011 and refused to pay for this medical coverage." (*Id.*) However, this conclusory statement, aside from having no support in the record, does not state an injury resulting from Grassel's ADA Section 12112(d) claim, the gravamen of which is that the DOE should not have even subjected Grassel to an eye exam or asked any questions about his vision issues, *not* that the DOE or Dr. Garner failed to properly *treat* his vision problems.[16]

---

[16] Though Grassel's assertion that the DOE is responsible for his eye problems is an Alice-in-Wonderland-type rabbit-hole the Court need not go down, it makes a few additional observations on this issue. First, the purpose of the 2011 Exam was not to treat Grassel's eye condition but to assess his mental and psychological capacity to carry out his work duties. Second, even if Grassel's complaint about the DOE's failure to conduct a proper eye exam stated a cognizable claim, the record shows that, after the 2011 Exam at which Grassel's vision problems were discussed, Grassel refused to appear for a follow-up exam, which Dr. Garner directed, in part, for the purpose of further examining Grassel's vision issues. Third, Grassel has not identified any evidence that supports his claim that the 2011 Exam *caused* his blindness— which the Court interprets, based on Grassel's conduct during the oral argument, as not referring to complete blindness, but some degree or type of visual impairment. At oral argument, Grassel explained that the 2011 Exam caused his blindness because his refusal to participate in any follow-up exam caused him to lose his insurance and thus he was forced to get eye surgery at a "cheaper place." However, there is no evidence supporting this string of assertions. Indeed, it should be noted that, prior to the 2011 Exam, Grassel had been suspended from his DOE job

Plaintiff also identifies, with little or no factual or evidentiary support, other "injuries" allegedly caused by the DOE or during his employment at the DOE: (1) he has been an "indentured servant," presumably of the DOE; (2) he has been subjected to "anti-Semitism"; (3) "injury in the line of duty"; and (4) "dismissal for complaining about this discrimination". (Pl. Supp. Opp. at ECF 3; Compl. Supp. at ECF 2.) However, none of these alleged injuries, to the extent the Court can discern what they mean, remotely relate to Grassel's ADA claim or the 2011 Exam.[17]

Finally, recognizing that any burden to show injury with respect to his ADA claim would be minimal, the Court asked Plaintiff at oral argument whether he felt harassed by having to attend the 2011 Exam, to which Plaintiff responded "No."[18]

---

since 1998 (after his initial refusal to be medically examined); thus, it seems unlikely, if not impossible, that Grassel only lost his health insurance after refusing to submit to a re-examination following the 2011 Exam. (*See* Hearing Op. at ECF 7; Grassel Dep. at ECF 179:4–7); *Grassel I*, 2015 WL 5657343 at *8 (finding that "Dr. Garner's determination that [Grassel] could not return to work pending further medical clearance was [merely] a continuation of the status quo [and] did not cause Grassel to lose pay", and thus was not an adverse employment action).

[17] In addition, Plaintiff's reliance on the DOE's memorandum outlining its policies and procedures on how to deal with employees injured at work as support for his claim of "injury in the line of duty" is inapposite. (Dkt. 1–1 at ECF 40.) And the Court previously granted summary judgment to Defendant on Plaintiff's retaliation claim, which was dismissed. *Grassel*, 2015 WL 5657343, at *13.

[18] THE COURT: . . . [I]t sounds to me the harm you [felt was being] harassed by having [to go] through another medical examination[,] is that fair?

GRASSEL: No.

THE COURT: You didn't feel harassed?

GRASSEL: No.

In sum, because the Court finds that Plaintiff has failed to meet even a minimal burden of demonstrating injury as a result of the DOE's alleged violation of ADA Section 12112(d)(4)(A), his ADA claim must be dismissed.

## CONCLUSION

For the reasons set forth above, the Court GRANTS summary judgment to Defendant on Plaintiff's impermissible medical examination and inquiry claim under the ADA, which is the sole claim remaining in this action. The Clerk of Court is respectfully directed to enter judgment in Defendants' favor and terminate this action.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 20, 2017
       Brooklyn, New York